COLUMBIA PACKING
COMPANY, Appellant,

v.

PENSION BENEFIT GUARANTY
CORPORATION, Appellee.

Civ. No. 85–2241–C.

United States District Court,
D. Massachusetts.

Jan. 6, 1988.

Richard E. Mikels, P.C., Whitton E. Norris III, Peabody & Brown, Boston, Mass., for appellant.

Angela Arnett, General Counsel, Pension Ben. Guar. Corp., Legal Dept., Washington, D.C., for appellee.

## MEMORANDUM

CAFFREY, Senior District Judge.

This matter is before the Court on an appeal from the decision of the Bankruptcy Court allowing certain claims by the Pension Benefit Guarantee Corporation as priority claims under 11 U.S.C. §§ 507(a)(1), (4). Both parties contest the Bankruptcy Court's decision. The issue on appeal is how much of the debtor's annual contribution to a funded employee pension plan should be accorded priority status under 11 U.S.C. §§ 507(a)(1), (4).

In 1969, the debtor established a funded pension plan for its union employees. The plan was a tax-qualified plan subject to Title IV of ERISA, 29 U.S.C. § 1001 *et seq.* Under the plan, participants were to receive on retirement a monthly pension for life. The amount of the monthly pension was equal to a dollar amount multiplied by the number of years an employee had worked for the debtor. The dollar amount was initially $1, but gradually increased to $14 by 1982.

Under the plan, Columbia Packing Company ("Columbia") was required to make periodic contributions to the pension fund in accordance with applicable Federal and State law. The minimum funding standards of ERISA require the employer to create an account called a funding standard account. 29 U.S.C. § 1082(b). The employer is required to make to this account annual contributions which are sufficient to eliminate any deficiencies in the account. 29 U.S.C. § 1082(a). The status of the funding standard account, and, therefore, the employer's contribution, is determined by an actuary, who charges or credits the account as directed by the statute. *See* 29 U.S.C. § 1082(b).

The actuarial method used by Columbia to determine the charges and credits is known as the frozen initial liability funding method. Under this method, the charges to the account are made up of two theoretical elements: the normal costs and the past service liability. *See* 29 U.S.C. § 1082(b)(2). The normal cost is the present cost of future pension benefits and administrative expenses assigned, under an actuarial cost method, to a particular time period. 29 U.S.C. § 1002(28). Thus, the normal cost is theoretically based on the present value of benefits to be paid in the future for the time worked during the period under consideration.

In contrast, the past service liability is based on the employees' years of service prior to the creation of the plan. See 29 U.S.C. § 1082(b)(2)(B). When the plan was first created, the employees were given credit for the time worked prior to that point. Thus, the plan started out with a large liability—the current value of pension benefits attributable to those pre-plan years. This liability is amortized over a number of years, as are any retroactive increases in the monthly dollar multiplier. 29 U.S.C. § 1082(b)(2)(B). These annual

amortized installments are the past service liabilities.

In this case, Columbia made its last contribution to the plan for the plan year ending October 31, 1981. On February 28, 1983, Columbia filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. The number of active employees covered by the plan decreased from 168 on September 16, 1982 to 105 on September 16, 1983. The plan was to be terminated by agreement on October 31, 1983. Columbia ceased business operations, however, on September 16, 1983. The claimant, Pension Benefit Guarantee Corporation ("PBGC"), was appointed statutory trustee of the pension fund on April 17, 1984. At the time the plan was terminated, the present value of pension benefits due plan participants exceeded the assets of the plan by $1,015,000. Accordingly, PBGC filed claims for $300,089, the amount by which the plan's funding deficiency increased between October 31, 1981 and October 31, 1983.[1] Included in these claims was a priority claim in the amount of $105,034 under 11 U.S.C. § 507(a)(1), and a priority claim of $79,699 under 11 U.S.C. § 507(a)(4).[2]

The Bankruptcy Court allowed a portion of PBGC's claims as priority claims. The Court determined the amount of the claim under § 507(a)(4) by first determining the fraction of the funding deficit attributable to the 180 day pre-filing priority period. This was done by dividing the number of days in the priority period (180) by the number of days over which the deficit accrued (November 1, 1981 to September 16, 1983, or 688 days), and multiplying this by the total funding deficit that accrued ($300,089). This result was then multiplied by the ratio of the average number of employees working during the priority period (137) over the average number of employees working during the prior reporting period (201). Using this method, the Court determined that PBGC's claim under § 507(a)(4) was $53,512.92. Similarly, the Court determined that the claim under § 507(a)(1) for the 203 day period (February 28, 1983 to September 16, 1983) was $300,089 times 203 days/688 days times 137 employees/201 employees, or $560,358.68.

■ Both parties agree that the normal cost element of the debtor's periodic contribution has priority under § 507(a)(4) and § 507(a)(4). The principle issue, then, is whether the past service liaibility element of the debtor's contribution should be given priority under § 507(a)(1) and (4). Technically, the question under § 507(a)(1) is whether such cost is an actual and necessary cost or expense of preserving the estate. The question under § 507(a)(4) is whether such cost arises from services rendered during the pre-filing priority period. The parties and the Bankruptcy Court assume, and this Court agrees, that the debtor's contribution to an employee pension fund is an actual and necessary cost or expense of preserving the estate if it arises from services rendered after the commencement of the case.

When Congress granted priority status for pre-filing contributions to employee

---

1. The parties has stiplated that $300,089 is the correct figure owed to the fund.

2. Sections 507(a)(1) and (4) reads:
§ 507. Priorities.
(a) The following expenses and claims have priority in the following order:
(1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28.

.     .     .     .     .

(4) Fourth, allowed unsecured claims for contributions to employee benefit plan—
(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
(B) for each such plan, to the extent of—
(i) the number of employees covered by such plan multiplied by $2,000; less
(ii) the aggregate amount paid to such employees under paragraph 3 of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.
Section 503(b) provides that the administrative expenses in § 507(a)(1) shall include the "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case. . . ."
11 U.S.C. § 503(b).

benefit plans, they recognized that in labor contract negotiations, fringe benefits may be substituted for wage demands. S. Rep. No. 95–989, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 6313. The contributions are thus analogous to wages in that the guarantee of future benefits is often considered by labor and management to be a form of present compensation. *See Alabama Power Co. v. Davis*, 431 U.S. 581, 592, 97 S.Ct. 2002, 2008, 52 L.Ed.2d 595 (1977) (noting that contributions to a pension fund, like wages, are current costs of doing business, and that future benefits can be traded off against current compensation). The legislative history therefore implies that in determining priority under § 507(a) employer contributions to employee benefit plans are to be placed on the same footing as wages, which are explicitly recognized as a cost of preserving the estate. As such, the first issue in this case boils down to the question whether the portion of an employer's contribution, which becomes payable during the priority period, but is calculated by reference to service rendered prior to the priority period, "arises from service rendered" during the priority period.

Columbia urges that *In Re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976) requires this Court to reverse the Bankruptcy Court. In *Mammoth Mart*, the Court was faced with the question whether employees' claims for severance pay were administrative expenses entitled to priority under the precursor of § 507(a)(1). The Court held that, because the severance pay was determined by length of service, the consideration supporting the claim was provided over the entire period of employment with the debtor. *Id.* at 955. Therefore, the part of the severance pay based on pre-filing employment was not entitled to priority. *Id.* The general rule from that case, then, is that in order for a claim to be awarded priority as an administrative expense, the consideration on which the claim is based must be supplied to the estate during the priority period.

In a case that is more analogous to this case, the Ninth Circuit Court of Appeals upheld the granting of priority status to an employer's contribution to an employee pension plan. *In Matter of Pacific Far East Line, Inc.*, 713 F.2d 476 (9th Cir.1983), the employer was required to contribute to employee benefit plans based on the number of days worked during the prior month. *Id.* at 477. After the employer filed its Chapter XI petition, the pension fund filed a priority claim for the contribution that accrued after the filing, but that was based on the man-hours worked prior to filing. The employer argued that this claim was based on a pre-filing indebtedness, and therefore was not entitled to priority.

The Court first noted that the Second Circuit had adopted the rationale from *Mammoth Mart. Id.* at 478–79. The Court agreed with the district court that the employer's contributions were analogous to the type of severance pay that is calculated without regard to length of employment, which pay is allowed as an administrative expense under the *Mammoth Mart* rationale. Therefore, the Court held, *Mammoth Mart* did not foreclose allowance of the claim as an administrative expense. *Id.* at 479.

The Court went on to state that the hours of pre-filing labor were not the consideration for the contributions, but were merely units of measure for the post-filing contributions. *Id.* at 479. This view is supported, the Court stated, by the fact that the employer's contributions were made to the pension fund rather than the employees. Therefore, the payments were distinguishable from wages. *Id.* This implies that the contributions cannot be tied directly to specific prior periods worked by employees as can wages. Rather, the payments should be viewed as compensation for the services performed during the period in which the obligation accrues.

Here, as in *Pacific Far East*, Columbia's obligation—the past service liability cost—was calculated by reference to services performed before the priority period. The obligation did not, however, accrue until after

the priority period began.[3] More importantly, the contribution is owed to the pension fund rather than the employees themselves. The past service liability cost is more properly viewed as an actuarial unit of measure for determining the employer's current periodic contribution than as compensation for work performed before the inception of the plan.

■ This view is consistent with the holding of the Bankruptcy Court, which correctly stated that the past service liability, together with the normal cost, are considered an ongoing, current cost of labor. As noted earlier, the legislative history of the Bankruptcy Reform Act recognizes the interchangeability of wages and pension benefits in labor negotiations. *See* S. Rep. No. 95–989, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 6311. The amount of wages foregone by employees is measured not by the normal cost alone, but by the employer's total current cost of funding a pension plan. The consideration for which the employees' present services are rendered is in reality the total annual contribution to the pension fund pro-rated on a daily basis. Under *Mammoth Mart*, then, both the normal cost and the past service liability cost of an employer's contribution "arise from" service rendered during the period in which the contribution accrues.

This conclusion, however, does not settle the matter. The Bankruptcy Court, as noted earlier, adjusted PBGC's claim downward to reflect the fact that the number of employees working during the priority period was less than the number of employees used to calculate Columbia's contribution for those periods. The Court noted that § 507(a) only grants priority to expenses which are "actual, necessary costs of preserving the estate," or are for "services rendered." Therefore, the Court concluded, it would be inappropriate for the Court

to adopt an amount based upon an assumed number of employees, rather than the actual number. Moreover, allowing the total daily contribution as a priority claim increases the likelihood that the pension fund will have adequate assets to pay current employees their future benefits. In this way, the Bankruptcy Court's approach furthers the purpose of priority status, which is to provide incentive for third parties to provide services to the debtor and thus increase the likelihood that the debtor will be able to stay in business. *Mammoth Mart*, 536 F.2d at 954.

The PBGC argues that the Court's adjustment was improper. It contends that, because the number of employees is only one of a number of factors used to determine the employer's contribution, the contribution does not decrease proportionally with a decrease in the number of employees. Moreover, PBGC argues that the entire funding cost, as calculated, accrued during the continuation of the plan during the priority period, and was therefore an ordinary and necessary cost of doing business.

This Court, however, agrees with the Bankruptcy Court that the employer's contribution should be adjusted to reflect the decrease in the number of employees. The PBGC itself admits that the number of employees is a factor used to determine the employer's contribution. The PBGC's chief of actuarial operations, Charles Gustafson, testified that the employer's contribution is calculated using an actuarial valuation of the plan that is made on a certain date. This actuarial valuation looks forward rather than backward, and attempts to estimate future events and conditions, such as number of employees, that would affect the amount of the employer's contribution. If an event that is not taken into account by the actuarial valuation occurs during the plan year, such as unforeseen layoffs, the

---

**3.** Columbia argues that *Pacific Far East* is not relevant since, in this case, the obligation arose at the inception of the plan year, before the priority period. The Court disagrees. Under ERISA, the employer is required to eliminate any accumulated funding deficiency by the *end* of the plan year. 29 U.S.C. § 1082(a)(1). One

could argue, then, that the contribution is "due" on the last day of the plan year. A more realistic view, under the circumstances, is to say that a pro rata portion of the annual contribution accrues on a daily basis over the entire plan year.

employer's contribution for that year is not necessarily affected. Instead, the employer would in effect overcontribute, or undercontribute as the case may be, for that year. This difference is then compensated for in future valuations, which would reflect the overpayment or underpayment. In addition to compensating for post-valuation changes in later years, the pension fund could alternatively calculate a new valuation that takes into account the new conditions.

In this case, the PBGC's claim is based on a valuation done on November 1, 1981 for the plan year ending October 31, 1982. In this valuation, the actuary assumed that there were 201 participating employees working during that year. However, on September 2, 1982—the beginning of the priority period under § 507(a)(4)—Columbia employed 168 plan participants. This number decreased to 135 by the time Columbia ceased operations.[4] An average of 137 participating employees were present during that period. Ideally, then, a new valuation should have been calculated as of the time Columbia ceased operations in order to accurately determine the amount of Columbia's contribution for that period. Since this was not done, it was up to the Court to estimate the proper amount that Columbia owes for the priority period. The PBGC is certainly correct that the relatively simple estimation done by the Court was not accurate.[5] Lack of certainty, however, should not prevent the Court from attempting to estimate the true amount of the priority claim. Therefore, the Bankruptcy Court was correct, under the circumstances, in adjusting the amount of PBGC's claim to reflect a decrease in employees. In doing so, the Court recognized that the employer's contribution to the plan is a current cost of labor, while also recognizing that the contribution must accurately reflect the "actual and necessary cost" of that labor.

Columbia argues, however, that the method the Court used to adjust the

PBGC's claim was incorrect. Rather than multiplying Columbia's contribution, by the ratio of the average number of employees during the priority period (137) over the number of employees used to calculate the contribution (201), as the Court did, Columbia urges that the Court should only apply this ratio to the normal cost. Columbia argues that the past service liability cost should be multiplied by a ratio which uses the total number of active and inactive participating employees, that is 260, instead of 201.

Columbia is correct that the normal cost must be adjusted separately from the past service liability cost. Only the normal cost varies with the number of present employees. The past service liability is essentially fixed at a certain time and amortized over time. It is, as noted earlier, a fixed cost of continuing the plan during the priority period. Therefore, the Bankruptcy Court did err in reducing the past service liability to account for the decrease in employees. Only the normal cost should have been adjusted to reflect the decrease in employees. In this way, the emloyer's contribution would more accurately reflect the amount that would have been due had a new valuation been done at the end of the priority period. Columbia's argument fails to recognize that the fixed, amortized past service liability is more accurately viewed as a current cost of continuing the plan rather than as a form of compensation for past service. The past service liability cannot be attributed to specific employees any more than it can be attributed to specific periods of employment.

■ To sum up, the amount of an employer's contribution that is payable under §§ 507(a)(1) and (4) is the amount of the standard funding account deficiency that accrues, on a daily basis, during the priority period, which amount is adjusted to reflect the true normal cost chargeable to the funding account during that period. Here, the total unpaid annual contributions to the

---

4. The decline in employees, however, was neither steady nor continuous. At one point, only 97 participants were employed.

5. For instance, the PBGC points out that if mostly younger employees were laid off, the employer's contribution would actually increase due to the actuarial methods employed by Columbia.

plan was $300,089 over 688 days, or $436.18 per day. Based on the actuarial report of November 1, 1981, 38.4% of this amount is attributable to the normal cost, while 61.6% is attributable to past service liability. The daily contribution attributable to normal cost ($167.49 per day) is then adjusted for the decrease in employees by multiplying it by the average number of employees employed during the priority period over the number of employees used in determining the unpaid annual contributions, or 137 employees/201 employees. The result, $114.16 per day, is then added to the daily amount attributable to the past service liability, and the sum is then multiplied by the number of days in the appropriate priority period. Thus, the amount of the claim under § 507(a)(4) is $114.16 per day plus $268.69 per day, times 180 days, or $68,913.[6] Similarly, the amount of the claim under § 507(a)(1) is $114.16 per day plus $268.69 per day, times 203 days, or $77,718.55.

Order accordingly.

## ORDER

In accordance with memorandum filed this date, it is ORDERED:

1. That the PBGC's administrative claim pursuant to 11 U.S.C. § 507(a)(1) shall be allowed in the amount of $77,-718.55;

2. That the PBGC's priority claim pursuant to 11 U.S.C. § 507(a)(4) shall be allowed in the amount of $68,913.00;

3. That the PBGC's non-priority, general unsecured claim shall be allowed in the amount of $153,457.45.

**6.** This amount, of course, does not take into account any adjustment required by § 507(a)(4)(B).