## In re SUNARHAUSERMAN, INC. and Hauserman, Inc., Debtors.

### Bankruptcy Nos. 89–04100, 89–04101.

United States Bankruptcy Court, N.D. Ohio.

June 15, 1995.

---

**274**

Michael D. Zaverton, Dettelbach, Sicherman & Baumgart, Cleveland, OH, for debtors.

Nathaniel Rayle, Office of the Gen. Counsel, Washington, DC, for Pension Benefit Guar. Corp.

### MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

The Pension Benefit Guaranty Corporation ("PBGC") filed claims in this case resulting from the termination of the Hauserman, Inc. Salaried Employees Retirement Income & Trust Plan (the "Plan"). The PBGC's claims arise under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq., ("ERISA"). The parties have resolved two of the PBGC's claims; two others remain in dispute. The PBGC asserts in claim 851 that it is entitled to a priority payment of $227,443 under section 507(a)(4) of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Code"), for unpaid minimum funding contributions attributable to the 180–day period preceding the date the Debtors filed their petition. In claim 853 the PBGC asserts that it is entitled to an administrative expense priority payment of $338,-143 under 507(b)(1) of the Code for unpaid minimum funding contributions which were due for the period after the Debtors' petition was filed until the Plan was formally terminated.

Debtors assert that the PBGC's priority claims should be limited to the normal cost component of the defaulted minimum funding contribution, which in the case of the 507(a)(4) claim is $162,319 and in the case of the administrative priority claim is $195,915, and that these normal cost components should be further adjusted to reflect reductions in the Debtors' work force and the freeze of Plan benefits that occurred prior to formal Plan termination. The parties have further stipulated that if the Debtors' approach were adopted it would reduce the PBGC's prepetition priority claim from $162,-319 to $133,489 and would reduce the postpetition administrative claim from $195,915 to $67,612.

### Background

Debtors filed for reorganization under chapter 11 on October 5, 1989. On January 26, 1990, Debtors amended the Plan to freeze benefit accruals effective February 13, 1990. On February 26, 1990, Debtors filed notice of their intent to effect a distress termination of the Plan pursuant to ERISA section 4041(c), 29 U.S.C. § 1341(c). The PBGC and Debtors thereafter entered into an agreement which terminated the Plan and fixed April 30, 1990, as the date of Plan termination. The PBGC filed its claims on July 16, 1990. The parties have briefed their positions at length and have agreed to submit their dispute for the Court's determination pursuant to their stipulations and pleadings. For the reasons set forth below the Court has determined that the PBGC's claims should be limited to the normal cost component of Debtors' minimum funding obligation adjusted to reflect actual service by employees covered by the Plan during the relevant periods.

### Analysis

ERISA established minimum funding standards for defined benefit pension plans to promote uniformity in funding and to avoid the practice of underfunding which jeopardized retiree benefits. *Pension Related Claims in Bankruptcy Code Cases,* Harold S. Novikoff and Beth M. Polebaum, 40 Business Lawyer 373, 376 (February 1985). The mini-

mum funding standard is defined in terms of a funding standard account which each plan is required to maintain.[1] Basically, an employer complies with its minimum funding obligation for a plan year if it contributes enough money for that plan year to avoid a deficiency in its funding standard account.

The normal cost component of the minimum funding obligation is an actuarial computation of the cost of benefits based on projected employment during the plan year. ERISA section 302(b)(2)(A), 29 U.S.C. § 1082(b). The other components of the minimum funding obligation for that plan year are based on an actuarial allocation of a portion of the costs to that year of such things as unfunded past service liability, whether due to past underfunding or to amendments to the plan, ERISA section 302(b)(2)(B)(i–iii), 29 U.S.C. § 1082(b)(2)(B)(i–iii), to experience losses, ERISA section 302(b)(2)(B)(iv), 29 U.S.C. § 1082(b)(2)(B)(iv), or to a change in actuarial assumptions, ERISA section 302(b)(2)(B)(v), 29 U.S.C. § 1082(b)(2)(B)(v). These "non-normal" costs are amortized over a number of years in accordance with prescribed formulae.

The paradigm for non-normal costs are unfunded pension liabilities based on work done before ERISA became effective. *See, e.g., LTV Corp. v. PBGC (In re Chateaugay Corp.)*, 130 B.R. 690 (S.D.N.Y.1991), *vacated, op. withdrawn, In re Chateaugay Corp.*, 17 Employee Benefits Cas. (BNA) 1102 (S.D.N.Y.1993). The non-normal component in the present case includes no such unfunded costs, although it does include a relatively small amount of past service costs based on the amortization of the costs of a plan amendment adopted in the plan year prior to the filing of this case. The lion's share of the non-normal cost of the unpaid minimum funding obligation arises from an experience loss also recognized in the plan year prior to the filing of the case. The parties have not specifically identified the nature of the experience loss. It could be based upon a diminution in plan assets or claims higher than projected. Possibly it reflects a reduction in projected interest rates which would reduce the projected return on assets, although this would more naturally appear to be a change in assumptions.

In any event, the experience loss was realized prepetition. The Plan's fiscal year began July 1 and ended June 30. Thus the experience loss was recognized at least three months before Debtors filed their reorganization petitions on October 5, 1989. The PBGC has not attempted to show that the nature of the experience loss affects the administrative expense status of its claim. If the nature of the loss were relevant, the PBGC had the burden of showing it. *Woburn Assoc. v.*

---

1. ERISA section 302(b), 29 U.S.C. § 1082(b), provides:

(b) Funding standard account.

(1) Each plan to which this part applies shall establish and maintain a funding standard account. Such account shall be credited and charged solely as provided in this section.

(2) For a plan year, the funding standard account shall be charged the sum of—

(A) the normal cost of the plan for the plan year,

(B) the amounts necessary to amortize in equal annual installments (until fully amortized)—

(i) in the case of a plan in existence on January 1, 1974, the unfunded past service liability under the plan on the first day of the first plan year to which this part applies over a period of 40 years,

(ii) in the case of a plan which comes into existence after January 1, 1974, the unfunded past service liability under the plan on the first day of the plan year to which this part applies over a period of 30 plan years,

(iii) separately, with respect to each plan year the net increase (if any) in unfunded past service liability under the plan arising from plan amendments adopted in such year, over a period of 30 plan years,

(iv) separately, with respect to each plan year, the net experience loss (if any) under the plan, over a period of 5 plan years ..., and

(v) separately, with respect to each plan year, the net loss (if any) resulting from changes in actuarial assumptions used under the plan, over a period of 10 plan years ...,

C. the amount necessary to amortize each waived funding deficiency (within the meaning of section 303(c) [29 U.S.C. § 1803(c)]) for each prior plan year in equal annual installments (until fully amortized) over a period of 5 plan years ..., and

D. the amount necessary to amortize in equal annual installments (until fully amortized) over a period of 5 plan years any amount credited to the funding standard account under paragraph 3(D).

*Kahn (In re Hemingway Transport, Inc.),* 954 F.2d 1 (1st Cir.1992).

Most courts that have published opinions on the question deny administrative expense status to pension funding claims which did not arise directly out of postpetition services. *See Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98 (2nd Cir. 1986); *PBGC v. Reorganized CF & I Fabricators of Utah, Inc. (In re CF & I Fabricators of Utah, Inc.),* 179 B.R. 704 (D.Utah 1994); *LTV Corp. v. PBGC (In re Chateaugay Corp.),* 130 B.R. 690 (S.D.N.Y.1991); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,* 160 B.R. 882 (Bankr.S.D.N.Y.1993); *In re Pulaski Highway Express, Inc.,* 57 B.R. 502 (Bankr. M.D.Tenn.1986); *In re Cott Corp.,* 47 B.R. 487 (Bankr.D.Conn.1984). *But see Columbia Packing Co. v. PBGC (In re Columbia Packing Co.),* 81 B.R. 205 (D.Mass.1988). According to the Second Circuit in *In re McFarlin's,*

> an expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession and "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business."

789 F.2d at 101 (citations omitted). The Second Circuit cited *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir.1976) and *In re Jartran, Inc.,* 732 F.2d 584 (7th Cir.1984) in support of its conclusion. *Mammoth Mart* and *Jartran* are widely cited in analyses of the Bankruptcy Code's administrative expense priority. The Sixth Circuit in *In re White Motor Corp.,* 831 F.2d 106 (6th Cir. 1987), also relied upon *Mammoth Mart* and *Jartran* in prescribing standards for administrative expense qualification.

In Mammoth Mart the court stated that a claimant must prove that the debt (1) arose from a transaction with the debtor in possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor in possession); and (2) directly and substantially benefited the estate.

*White Motor, supra,* at 110.

The PBGC attempts to distinguish *White Motor* on the ground that it involved a contractual claim, not one arising under statute. This distinction misses the mark. *White Motor* broadly supports the approach in *Mammoth Mart* and *Jartran* that administrative claims are to be limited to those where the consideration for the claim was received during the postpetition period. It appears more relevant to the analysis in *White Motor, Mammoth Mart,* and *Jartran* to determine whether the consideration or benefit for the claim relates to the postpetition period than whether the basis for the claim is contractual or statutory.

The PBGC also appeals to *Lancaster v. Tennessee (In re Wall Tube & Metal Products Co.),* 831 F.2d 118 (6th Cir.1987), an opinion which came down the day after *White Motor* and was written by the same judge, for the proposition that an expense need not benefit the estate to qualify for administrative priority. In *Wall Tube* the court held that Tennessee's claim for cleanup of hazardous waste stored on the debtor's property was entitled to administrative expense priority. The court in *Wall Tube* justified its holding on the authority of *Midlantic National Bank v. New Jersey Dept. of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), and *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649, (1985), which "created a special emphasis on the importance of complying with laws that protect the public health and safety." *Wall Tube,* 831 F.2d at 123. Like *Wall Tube* both cases dealt with hazardous waste. The PBGC suggests no persuasive reason why the special concern for public health and safety evident in these environmental cases should apply to its claims.

It is of course true that to the extent that the PBGC's claims are unmet taxpayers will bear the burden of any shortfall. But this is generally true for any unpaid governmental claims, whether federal, state or local. It is Congress' prerogative to assign priorities. *Joint Industry Bd. of Elec. Indus. v. United States,* 391 U.S. 224, 229, 88 S.Ct. 1491, 1494,

20 L.Ed.2d 546 (1968). It has not done so for the PBGC's claim. This Court has no authority to confer priority on the PBGC's claim on the basis of a weak analogy to cases involving immediate threats to public health and safety.

The PBGC also cites *Alabama Surface Mining Commission v. N.P. Mining Co., Inc. (In re N.P. Mining Co., Inc.)*, 963 F.2d 1449 (11th Cir.1992), in support of its argument. In that case the debtor was a strip miner whose postpetition operations violated Alabama's laws policing strip mining resulting in an assessment of civil penalties against the debtor. The court accorded those penalties administrative expense priority on the ground, in part, that they arose out of the ordinary prosecution of the debtor's business for which the debtor could not evade responsibility because it was in reorganization. *Id.* at 1454. The court cited *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), to support the conclusion that a debtor is responsible for liabilities incurred by it in its postpetition operations. In *Reading* the Supreme Court held that the claims of neighboring property owners arising out of a catastrophic fire caused by the negligence of an employee of the trustee were entitled to administrative priority. But *Reading* and *N.P. Mining* are distinguishable.

In both cases the question was whether liabilities arising in the ordinary course of the debtor's business operations should be paid in full despite the fact that the debtor had received no corresponding benefit and that their payment would deplete the funds distributable to innocent creditors. Neither case involved the issue central to this proceeding—allocation of the liability between pre and postpetition operations. There is no dispute that the PBGC has a postpetition administrative claim—it does—only the extent of that claim is in issue. No such allocation question was before the courts in *Reading* or *N.P. Mining*.

In its brief the PBGC proposes a hypothetical to dramatize its argument that its full claim is entitled to administrative priority without regard to the time when employee services were rendered or to the Debtors'

diminishing work force. In the PBGC's hypothetical a debtor amended its plan postpetition to increase benefits for past services in order to allay current labor unrest. The PBGC argues that under these circumstances the full cost of funding the cost of the plan amendment should be accorded priority status even though that cost is measured by prepetition services. Its conclusion is correct, but not for the reason it suggests. The hypothetical debtor chose postpetition to increase its pension costs in order to preserve and protect its assets and business. It received the services and benefit it bargained for postpetition and under *White Motor, Mammoth Mart*, and *Jartran* the corresponding liability would be entitled to administrative priority.

In this case the Debtors made no such choice; rather their history was one of rapid reductions in work force. Instead of increasing benefits they stopped further benefit accruals on February 13, 1990, well prior to the April 30 formal termination day. There is nothing in this record to suggest that the minimum funding liability for the Plan year in which the Debtors' business terminated enhanced or promoted any objective of the Debtors.

The PBGC's position is grounded on the assertion that the Debtors' minimum funding obligation was a cost of doing business postpetition without regard to anything that actually occurred postpetition except the formal termination of the plan on April 30, 1990. No case has been cited to the Court which supports this position. *Columbia Packing, supra,* which does support the PBGC's position on the non-normal component of the minimum funding obligation, holds that the normal component must be adjusted to reflect the postpetition decrease in the number of the debtor's employees. 81 B.R. at 209. It would in fact be anomalous to accord administrative expense to the cost of pension benefits for postpetition services where there were little or no postpetition services. But this is what a finding for the PBGC would require.

The ERISA minimum funding standard computes present funding obligations on the basis of past experience and projections.

Present changes are to be reflected in future projections. Where, as here, the business cannot be reorganized and the debtor takes steps to terminate the plan soon after the case is filed, the postpetition changes in employment will never be reflected. Under these circumstances the administrative component of the PBGC's claim can and should be limited to the pension costs arising out of actual postpetition services.

For this reason the Court rejects the conclusion in *Columbia Packing Co., supra*, that the non-normal component of the minimum funding obligation should be accorded administrative expense priority. The court in that case appears to have assumed that unless the non-normal component could be tied to prepetition services, it must be accorded administrative priority status as a postpetition liability. 81 B.R. at 209. But this assumption reverses the generally accepted principle that the claimant has the burden of showing that its claim arises out of postpetition activity if it is to be accorded administrative expense priority. See *In re White Motor Corp.*, 831 F.2d at 110; *In re Hemingway Transport, Inc.*, 954 F.2d at 5; *In re Finley, Kumble*, 160 B.R. at 890.

To the extent that the court's holding in *Columbia Packing* was based on a finding that the debtor received consideration for the non-normal component of the minimum funding obligation postpetition, that case is distinguishable. In this case the Debtors froze the accrual of benefits to employees promptly after the case was filed and effected a distress termination soon thereafter. There is no basis to find that the Debtors benefited from or received consideration for the non-normal component through motivation of employees or otherwise. *Wyle v. Pacific Maritime Assoc. (In re Pacific Far East Line, Inc.)*, 713 F.2d 476 (9th Cir.1983), which the PBGC cites to support its argument is distinguishable. In *Pacific Far East Line* the court rebuffed the effort of the trustee in a Bankruptcy Act case to recover postpetition pension plan payments made by the debtor pursuant to an order of the bankruptcy court while operating under chapter XI of the Bankruptcy Act. In that case the debtor made monthly contributions to the plan based on the number of man days worked by its employee seamen during the prior month. The trustee argued that payments measured by prepetition labor were ineligible for administrative cost priority under Ninth Circuit authority dealing with severance pay. So far as appears, he did not contend that postpetition work force reductions made the prior month's experience inaccurate. The issue of non-normal costs was not raised in the case.

In this case the parties have stipulated not only to the extent of the work force reduction during the postpetition period but on the amount of the postpetition normal costs adjusted to reflect that reduction. This stipulation reflects the best measure of the amount of the PBGC's claim that arose out of the Debtors' postpetition operations. Therefore, the Debtors' minimum funding liability is entitled to administrative expense priority only to the extent that it relates to benefits earned by covered employees during the postpetition period and until the accrual of benefits was frozen. The Court finds that the parties' last stipulation, which adjusts the normal cost component of the PBGC's postpetition claim based on actual employment levels, provides the appropriate basis on which to allocate the PBGC's claim between prepetition and postpetition periods for purposes of determining the extent of its administrative expense priority.

The decision to similarly limit the PBGC's priority under section 507(a)(4) is based on the considerations discussed above and is reinforced by the statutory language. Section 507(a)(4) provides:

> The following expenses and claims have priority in the following order:
>
> . . . .
>
> (4) Fourth, allowed unsecured claims for contributions to an employee benefit plan—
>
> (A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
>
> (B) for each such plan, to the extent of—

(i) the number of employees covered by each such plan multiplied by $2,000; less

(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

The language "arising from services rendered within 180 days before the date of the filing of the petition" invites, if it does not compel, an effort to match the services rendered within the 180–day period prior to the filing with the pension costs attributable to those services. The stipulated report of the PBGC's actuary accomplishes this match. It is true that the 180–day period comprises about one quarter of the 1989 plan year during which the experience loss occurred and in which the plan amendment increasing past service costs was adopted. However the PBGC has shown no connection between these events and the 180–day priority period and the Court is aware of none. The PBGC had the burden of showing such connection if it existed.

The Court's order in conformity with this opinion is attached.

## ORDER

A memorandum of opinion having been issued this day with respect to the claims asserted by the Pension Benefit Guaranty Corporation ("PBGC") in this case and, for the reasons stated therein,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT

1. Claim number 851 asserted by the PBGC be, and it hereby is, allowed as a priority claim under 11 U.S.C. § 507(a)(4) in the amount of $133,489.00.

2. Claim number 853 asserted by the PBGC be, and it hereby is, allowed as an administrative claim under 11 U.S.C. § 503(b) in the amount of $67,612.00.