ELECTRONIC CITATION: 2008 FED App. 0018P (6th Cir.)
File Name: 08b0018p.06

## BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT

In re: HNRC DISSOLUTION CO. f/k/a )
HORIZON NATURAL RESOURCES )
COMPANY, et al., )
     )
       Debtors. )
_____ )
     )
     )
UNITED MINE WORKERS OF AMERICA 1974 )     No. 06-8067
PLAN AND TRUST, et al., )
     )
       Appellants, )
     )
v. )
     )
LEXINGTON COAL COMPANY, LLC, )
     )
       Appellee. )
_____ )

Appeal from the United States Bankruptcy Court
for the Eastern District of Kentucky at Ashland.
No. 02-14261.

Argued: May 2, 2007[1]

Decided and Filed: November 4, 2008

Before: AUG, GREGG, and PARSONS, Bankruptcy Appellate Panel Judges.

_____

[1] Although this appeal was argued before the Bankruptcy Appellate Panel of the Sixth Circuit on May 2, 2007, in January 2008 the Panel was reconstituted to include Judge Aug. At that time, the parties were given the opportunity to reargue the case or otherwise supplement the record. The parties declined to do so.

---

**COUNSEL**

**ARGUED:** John C. Goodchild, III, MORGAN, LEWIS & BOCKIUS, LLP, Philadelphia, Pennsylvania, for Appellants. Gregory R. Schaaf, GREENEBAUM DOLL & McDONALD PLLC, Lexington, Kentucky, for Appellee. **ON BRIEF:** John C. Goodchild, III, MORGAN, LEWIS & BOCKIUS, LLP, Philadelphia, Pennsylvania, Mark Murphy, Richard C. Welch, MOONEY, GREEN, BAKER & SAMDON, P.C., Washington, D.C., Jerome J. Metz, Jr., PORTER WRIGHT MORRIS & ARTHUR LLP, Cincinnati, Ohio, for Appellants. Gregory R. Schaaf, John F. Billings, GREENEBAUM DOLL & McDONALD PLLC, Lexington, Kentucky, C.R. Bowles, Benjamin J. Evans, Raja J. Patil, GREENEBAUM DOLL & McDONALD PLLC, Louisville, Kentucky, for Appellee.

---

**OPINION**

---

JAMES D. GREGG, Bankruptcy Appellate Panel Judge. Horizon Natural Resources Company and several of its subsidiaries and affiliates (collectively, the "Debtors") participated in a multiemployer pension plan, the United Mine Workers of America 1974 Pension Plan and Trust ("1974 Plan"), until the Debtors terminated operations approximately two years after filing their chapter 11 cases. Termination of the Debtors' operations constituted a complete withdrawal from the 1974 Plan and caused the Debtors to incur withdrawal liability under ERISA. The 1974 Plan appeals the bankruptcy court's order denying its application for allowance of a $36,248,771 administrative expense claim. The 1974 Plan asserts that this amount represents the portion of the Debtors' total withdrawal liability that relates to the Debtors' postpetition operations. For the reasons that follow, the bankruptcy court's order is AFFIRMED.

## I. ISSUES ON APPEAL

The overarching issue in this appeal appears to be deceptively simple: did the bankruptcy court abuse its discretion when it determined that the postpetition portion of the 1974 Plan's withdrawal liability claim was not entitled to administrative expense priority? However, the answer to this broad question requires consideration of two complex and difficult sub-issues: (1) did the bankruptcy court err when it concluded that the 1974 Plan failed to establish that the withdrawal

liability, or a portion thereof, represented a "direct and substantial benefit" to the Debtors' bankruptcy estate under the "benefit to the estate" test established by the United States Court of Appeals for the Sixth Circuit in *Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 816 (6th Cir. 1997); and (2) did the bankruptcy court err when it applied the "benefit to the estate" test, because the exception set forth by the United States Supreme Court in *Reading Co. v. Brown*, 391 U.S. 471, 88 S. Ct. 1759 (1968), may apply to the withdrawal liability claim?

## II.    JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Eastern District of Kentucky has authorized appeals to the Panel, and a final order of the bankruptcy court may be appealed by right under 28 U.S.C. § 158(a)(1).  For the purpose of an appeal, an order is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989).  The bankruptcy court's order denying the 1974 Plan's application for an administrative expense claim is a final order. *Volvo Commercial Fin. LLC the Americas v. Gasel Transp. Lines, Inc. (In re Gasel Transp. Lines, Inc.)*, 326 B.R. 683, 685 (B.A.P. 6th Cir. 2005) ("An order determining that a claim is not entitled to administrative expense priority constitutes a final order.").

This Panel reviews the bankruptcy court's denial of administrative expense priority status for an abuse of discretion. *See Beneke Co. v. Econ. Lodging Sys., Inc. (In re Econ. Lodging Sys., Inc.)*, 234 B.R. 691, 693 (B.A.P. 6th Cir. 1999).  The bankruptcy court's ruling on the 1974 Plan's motion for reconsideration is also reviewed under the abuse of discretion standard. *See Eglinton v. Loyer (In re G.A.D., Inc.)*, 340 F.3d 331, 334 (6th Cir. 2003) (denial of a Rule 60(b) motion is reviewed for abuse of discretion); *Heath v. Am. Express Travel Related Servs. Co. (In re Heath)*, 331 B.R. 424, 429 (B.A.P. 9th Cir. 2005) (denial of a motion to reconsider allowance or disallowance of a claim under Rule 3008 is reviewed for abuse of discretion).  "An abuse of discretion occurs only when the trial court relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Schmidt v. Boggs (In re Boggs),* 246 B.R. 265, 267 (B.A.P.

6th Cir. 2000). "The question is not how the reviewing court would have ruled, but rather whether a reasonable person could agree with the bankruptcy court's decision; if reasonable persons could differ as to the issue, then there is no abuse of discretion." *Mayor of Baltimore, Md. v. W. Va. (In re Eagle-Picher Indus., Inc.)*, 285 F.3d 522, 529 (6th Cir. 2002); *Lebovitz v. Hagemeyer (In re Lebovitz)*, 360 B.R. 612, 615 (B.A.P. 6th Cir. 2007).

### III.  FACTS

The Debtors were parties to collective bargaining agreements with the United Mine Workers of America ("UMWA"). These agreements, known as National Bituminous Coal Wage Agreements ("NBCWAs"), governed the terms and conditions of employment of the UMWA-represented miners by establishing applicable wages and benefits to be paid to the miners by the Debtors. Among the benefits established under the NBCWAs was the requirement that the Debtors participate in the 1974 Plan. The 1974 Plan is an irrevocable trust established pursuant to § 302(c)(5) of the Labor-Management Relations Act, *see* 29 U.S.C. § 186(c)(5), and is also a multiemployer defined benefit pension plan under § 3(37)(A) of ERISA, s*ee* 29 U.S.C. § 1002(37)(A). Miners employed by the Debtors accrued pension and death benefits in the 1974 Plan for every hour they worked under the NBCWAs.

ERISA requires pension plans, such as the 1974 Plan, to maintain assets sufficient to meet future pension liabilities. *See* 29 U.S.C. § 1052. To meet this requirement, participating employers are subject to two distinct types of liability – periodic contributions and withdrawal liability. The periodic contribution rates are established through collective bargaining and are set forth in the NBCWAs. Under the NBCWAs, the contributions required by the 1974 Plan were based upon the hours worked by each UMWA miner. Withdrawal liability, by contrast, is imposed by federal statute, s*ee* 29 U.S.C. § 1381, and represents an employer's obligation upon its withdrawal from a multiemployer pension plan to pay its proportionate share of the plan's total unfunded vested

benefits.[2] Unfunded vested benefits (sometimes referred to as "UVBs") are defined under the statute as the difference between the present value of vested benefits and the current value of the plan's assets. *See* 29 U.S.C. § 1391.

On November 13 and 14, 2002, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[3] The Debtors operated their businesses as debtors-in-possession for almost two years after their cases were commenced. During that time, they employed over 1,000 UMWA-represented employees. The Debtors estimate that their employees worked a combined total of 2,976,962 hours during the postpetition period.

---

[2] Section 1381 states as follows:

(a) If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.

(b) For purposes of subsection (a) of this section–

    (1) The withdrawal liability of an employer to a plan is the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits, adjusted–

        (A) first, by any de minimis reduction applicable under section 1389 of this title,

        (B) next, in the case of a partial withdrawal, in accordance with section 1386 of this title,

        (C) then, to the extent necessary to reflect the limitation of annual payments under section 1399(c)(1)(B) of this title, and

        (D) finally, in accordance with section 1405 of this title.

    (2) The term "complete withdrawal" means a complete withdrawal described in section 1383 of this title.

    (3) The term "partial withdrawal" means a partial withdrawal described in section 1385 of this title.

29 U.S.C. § 1381.

[3] Because the Debtors filed their bankruptcy petitions prior to October 17, 2005, this appeal is governed by the Bankruptcy Code without regard to the amendments made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. All statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1330 (2004), unless otherwise noted.

While operating postpetition, the Debtors paid all necessary wages and made all required contributions for benefits due to employees under the NBWCAs.  In fact, during the terms of the 1998 and 2002 NBCWAs, participating employers, including the Debtors, were not required to make any contributions to the 1974 Plan.  Because the 1974 Plan was fully funded at that time, pursuant to a provision in the 1998 NBCWA, requisite employer contributions were zero cents per hour. However, in the plan year ending June 30, 2001, an actuarial funding deficit arose between the future value of vested benefits and the 1974 Plan assets.  According to the 1974 Plan, the deficit resulted from a number of factors, including a dip in the stock market, lack of incoming contributions, and changes in pensions.  As a result, the 1974 Plan began to report unfunded vested benefits during the plan year ending June 30, 2001.

After unsuccessfully attempting to reorganize during the postpetition period, the Debtors determined to sell substantially all of their assets.  On July 11, 2004, the Debtors filed their Third Amended Joint Plan of Reorganization and Third Amended Joint Plan of Liquidation (the "Chapter 11 Plans").  As contemplated by the Chapter 11 Plans, a court-approved auction sale of the Debtors' assets was held on August 17, 2004.  Lexington Coal Company, LLC ("Lexington Coal"), the Appellee in the present appeal, was among the successful purchasers.  On September 16, 2004, the bankruptcy court entered orders confirming the Chapter 11 Plans.  On September 30, 2004, the Debtors consummated the sale of their assets to the approved purchasers, including Lexington Coal;[4] the Chapter 11 Plans became effective; and the Debtors rejected the NBCWAs.[5]  In accordance with the court's orders confirming the Chapter 11 Plans, the Debtors were then deemed dissolved.

The 1974 Plan asserts, and Lexington Coal does not dispute, that the Debtors terminated covered operations on September 27, 2004.  According to the 1974 Plan, this cessation of operations

---

[4] The Debtors sold their going-concern operations for more than $481 million in secured claims and $304 million in cash.

[5] In August 2004, the bankruptcy court granted the Debtors' motion requesting authority to reject all of their collective bargaining agreements.  Pursuant to the bankruptcy court's order, the Debtors rejected the NBCWAs on or around September 30, 2004.  The rejection coincided with the closing of the sale of the Debtors' assets.

constituted a complete withdrawal from the 1974 Plan during the Plan year ending June 30, 2004.[6] Because the 1974 Plan had unfunded vested benefits at that time, the Debtors' withdrawal from the 1974 Plan gave rise to withdrawal liability under ERISA.

On December 27, 2004, the 1974 Plan filed an administrative expense claim for the postpetition portion of the Debtors' withdrawal liability. The 1974 Plan's determination of the amount of the Debtors' postpetition withdrawal liability required a three-step calculation. First, the 1974 Plan calculated the total amount of the Plan's unfunded vested benefits at the time of the Debtors' withdrawal. Next, the 1974 Plan determined what portion of the Plan's total unfunded vested benefits was attributable to the Debtors. To accomplish this the 1974 Plan utilized a modified version of the "Rolling-5" method set forth in the withdrawal liability statute. The 1974 Plan divided the hours worked by the Debtors' employees during the five years preceding withdrawal by the total hours worked by all employees during that same period. The resulting percentage was then multiplied by the 1974 Plan's total unfunded vested benefits to determine the Debtors' total withdrawal liability. In accordance with this calculation, the 1974 Plan asserted that the Debtors' total withdrawal liability as of June 30, 2004, was $224,986,733.

The 1974 Plan then determined what portion of the Debtors' total withdrawal liability was attributable to work performed by the Debtors' employees postpetition. The 1974 Plan calculated this amount by dividing the hours worked by the Debtors' employees postpetition by the total hours worked by the Debtors' employees during the five years immediately preceding withdrawal. This calculation resulted in approximately 8.7% of the total withdrawal liability being allocated to the postpetition period. Accordingly, the 1974 Plan alleged that 8.7% of the Debtors' $224,986,733 total withdrawal liability, or $19,580,146, was entitled to treatment as an administrative expense claim.

---

[6] Under 29 U.S.C. § 1391, the "charge-determination" section of ERISA, the withdrawal liability calculation is to be made, "not as of the day of withdrawal, but *as of the last day of the plan year preceding the year during which the employer withdrew . . . .*" *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 417-18, 115 S. Ct. 981, 986 (1995) (citing 29 U.S.C. §§ 1391(b)(2)(A)(ii), (b)(2)(E)(i), (c)(2)(C)(i), (c)(3)(A) and (c)(4)(A) (emphasis in original)).

On March 17, 2005, Lexington Coal filed an objection to the 1974 Plan's administrative expense claim.[7] Lexington Coal asserted that the 1974 Plan's claim did not qualify as an administrative expense because the withdrawal liability did not directly and substantially benefit the Debtors' estate. Following a status conference on May 19, 2005, the bankruptcy court issued a scheduling order stating that it would "deal first with legal issues that may avoid the need for discovery." (J.A. at tab 7.) Accordingly, the court instructed the parties to brief the legal issues set forth in the objection.

After legal memoranda were filed by the 1974 Plan and Lexington Coal, the 1974 Plan responded by filing an amended administrative expense claim seeking $36,248,771 as postpetition withdrawal liability ("Amended Claim"). The Amended Claim listed the total amount of withdrawal liability attributable to the Debtors as $138,354,090, a *decrease* from the original calculation of $224,986,733. Attachments to the Amended Claim stated that this decrease derived from a change in the interest rate assumption the 1974 Plan applied to calculate its unfunded vested benefits.[8] However, the amount the 1974 Plan sought as an administrative expense *increased* from $19,580,146 to $36,248,771. The 1974 Plan explained that the original claim utilized an inaccurate withdrawal date, which caused the hours worked during a full year of the postpetition period to be excluded from the calculation. Correction of this error resulted in 26.2%, rather than 8.7%, of the Debtors' total withdrawal liability being allocated to the postpetition period.[9]

---

[7] Pursuant to the bankruptcy court's orders confirming the Chapter 11 Plans, Lexington Coal has standing to object to administrative expense claims.

[8] Based on the revised interest rate utilized by the 1974 Plan, the 1974 Plan's total unfunded vested benefits at the end of the 2004 Plan year were approximately $1.8 billion. Had the interest rate assumption not been changed, the 1974 Plan's total unfunded vested benefits at the end of the 2004 Plan Year would have been approximately $2.1 billion, and the Debtors' total withdrawal liability claim would have been approximately $163 million.

[9] After the 1974 Plan filed its Amended Claim, the bankruptcy court requested further information from the 1974 Plan, including: a statement of the amount of the withdrawal liability as of June 30, 2002, and as of June 30, 2004; a statement of the amount of the withdrawal liability that would have been assessed against the Debtors if withdrawal had occurred on the date the chapter 11 petitions were filed; and an explanation of the interest rate used in calculating the withdrawal liability reflected in the 1974 Plan's original claim. On September 14, 2005, the 1974 Plan provided the information requested by the court.

On November 7, 2005, the bankruptcy court issued a Memorandum Opinion denying administrative expense priority for the Amended Claim. The court began its analysis by noting that the Debtors' withdrawal liability did not arise until the Debtors ceased business operations, almost two years after the filing of their chapter 11 cases. However, the court explained that the liability was not automatically considered an administrative expense "simply because [it] accrued after the filing of the bankruptcy proceeding." (J.A. at tab 14, p. 7.) The Debtors were still required to show that the withdrawal liability provided a direct and substantial benefit to the estate. Although the bankruptcy court acknowledged the possibility of pro-rating the withdrawal liability for purposes of classifying a portion of the liability as an administrative expense, it considered the use of past contribution experience in making such a calculation problematic. The court observed that the liability had "accumulated over many years" and that the amount of the liability was "clearly dependent, among other things, upon the success of the [1974 Plan's] investments as administered by the trustees of the fund, and contributions by other employers." (J.A. at tab 14, p. 6.) To illustrate this point, the court noted that the Debtors' total withdrawal liability as of the chapter 11 petition date, November 13, 2002, would have been approximately $145,307,051. On the date of the Debtors' actual withdrawal from the 1974 Plan, September 27, 2004, their total withdrawal liability was $138,354,090. Therefore, the Debtors' total withdrawal liability decreased by approximately $7 million during the pendency of the Debtors' chapter 11 case. The court further suggested that the Debtors' method of calculation would result in "more and more of the withdrawal liability [being] converted . . . to an administrative claim" simply by the passage of time, "without any demonstration of benefit to the estate." (J.A. at tab 14, p. 9.) Because no additional indebtedness was created during the administration of the Debtors' estate, the court concluded that the 1974 Plan had failed to demonstrate that the withdrawal liability upon which the Amended Claim was based directly and substantially benefitted the Debtors' estate.[10]

On November 17, 2005, the 1974 Plan filed its Motion for Reconsideration pursuant to Rule 3008, or in the Alternative, to Alter or Amend Judgment, or for Relief from Judgment pursuant to Rules 7052, 9023 and 9024 ("Motion to Reconsider"). The bankruptcy court held a hearing

---

[10] The bankruptcy court disallowed the withdrawal liability claim under 11 U.S.C. § 503(b). Therefore, it declined to address Lexington Coal's assertion that the claim resulted from the Debtors' rejection of the collective bargaining agreements and constituted a prepetition unsecured claim under 11 U.S.C. § 365(g) or § 502(g). We also see no reason to address § 365(g) or § 502(g) in this appeal.

regarding the Motion to Reconsider on January 19, 2006. At the hearing, over the objection of Lexington Coal, the bankruptcy court allowed the 1974 Plan to present evidence as to factual matters concerning the calculation of the Amended Claim. This evidence included testimony from the 1974 Plan's comptroller and an actuarial consultant, both of whom explained that the decrease in the Debtors' total withdrawal liability during the pendency of their chapter 11 cases resulted primarily from a change in actuarial assumptions. Specifically, the witnesses testified that in November 2004, the 1974 Plan changed the interest rate assumption it applied to calculate the 1974 Plan's unfunded vested benefits. This new interest rate applied to all withdrawals occurring after June 30, 2004, and the effect of the revised assumption was to lower the 1974 Plan's total unfunded vested benefits. Under the new interest rate, the Debtors' total withdrawal liability as of the withdrawal date, June 30, 2004, was approximately $138 million. However, according to the 1974 Plan's comptroller, the Debtors' total withdrawal liability would have been approximately $163 million had the prior interest rate assumption remained in effect. If the Debtors had withdrawn from the 1974 Plan as of the petition date, their total withdrawal liability would have been approximately $145 million. Consequently, but for the change in interest rate assumption, the Debtors' total withdrawal liability would have increased (from $145 million to $163 million) during the pendency of their chapter 11 cases. Because the decrease in the Debtors' total withdrawal liability resulted from the change in interest rate assumption, the 1974 Plan asserted that the decrease was not indicative of the benefit (or lack thereof) provided to the Debtors' bankruptcy estate.

At the hearing on the Motion to Reconsider, the 1974 Plan also argued that, to the extent the bankruptcy court held that the withdrawal liability claim could have some potential benefit to the estate, the 1974 Plan should be permitted to present additional evidence in support of its quantification of that benefit. In this respect, the 1974 Plan stated that the Rolling-5 method was not the only way to calculate the portion of the Debtors' total withdrawal liability that should be allocated to the postpetition period. As an alternative to the Rolling-5 method, the 1974 Plan suggested that the allocation could be made by evaluating how much pension credit the Debtors' employees earned during the two years the Debtors operated postpetition.

On March 6, 2006, the bankruptcy court issued a second Memorandum Opinion addressing the Motion to Reconsider. In its opinion, the court again emphasized the many factors that contributed to the Debtors' withdrawal liability. These factors included the actuarial assumptions

relied upon in calculating the amount of the liability. However, the court concluded that the 1974 Plan had failed, once again, to show that the withdrawal liability arose because of a direct and substantial benefit to the estate. Accordingly, the bankruptcy court denied the Motion to Reconsider. This timely appeal followed.

## IV. DISCUSSION

The 1974 Plan appeals the bankruptcy court's denial of its administrative expense claim on several grounds. First, the 1974 Plan argues that, under established case law, the bankruptcy court was required to allocate the withdrawal liability claim between prepetition and postpetition periods. Because the Debtors' employees continued to work for the Debtors during the pendency of the chapter 11 cases and accrued pension credits during that time, the 1974 Plan asserts that the postpetition portion of the withdrawal liability claim is entitled to priority as an administrative expense under the Sixth Circuit's "benefit to the estate" test. *See Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 816 (6th Cir. 1997). The 1974 Plan further asserts that it was prejudiced by the bankruptcy court's bifurcated analysis of its withdrawal liability claim. That is, to the extent the bankruptcy court determined that the 1974 Plan failed to demonstrate a direct link between the alleged benefit to the Debtors' estate and the postpetition withdrawal liability, the 1974 Plan argues that it should have been permitted to present additional factual evidence regarding quantification of the postpetition portion of the claim and its relationship to the work performed by the Debtors' employees. Alternatively, the 1974 Plan alleges that the postpetition portion of its withdrawal liability claim is entitled to administrative priority under the Supreme Court's decision in *Reading Co. v. Brown*, 391 U.S. 471, 88 S. Ct. 1759 (1968). Specifically, the 1974 Plan characterizes its withdrawal liability claim as a statutory obligation that was incidental to the operation of the Debtors' businesses. Utilizing *Reading*, the 1974 Plan argues that such claims are entitled to administrative priority, regardless of whether the Debtors' estate received any corresponding benefit.

This Panel will address each of the 1974 Plan's arguments in turn. However, because a general understanding of withdrawal liability is crucial to our analysis of the 1974 Plan's purported

administrative claim, we begin our discussion with a brief recitation of the history of withdrawal liability, how it is calculated, and when a claim may arise in a bankruptcy case.

## A.      Nature of Withdrawal Liability.

### *1. Historical Background and Purpose of Withdrawal Liability.*

Before ERISA was amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381-1453 (the "MPPAA"), employers who withdrew from underfunded pension plans were "not necessarily required to pay [their] share of unfunded, vested benefits."  *CPT Holdings, Inc. v. Indus. & Allied Employees Union Pension Plan, Local 73*, 162 F.3d 405, 407 (6th Cir. 1998) (citing *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 416-17, 115 S. Ct. 981 (1995)).  As long as the plan did not become insolvent during the five years following the employer's withdrawal, the employer avoided all liability. *CPT Holdings, Inc.*, 162 F.3d at 407 (citing 29 U.S.C. § 1364).  Unfortunately, under this system, "withdrawals of contributing employers from a multiemployer pension plan frequently result[ed] in substantially increased funding obligations for employers who continue[d] to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor-management relations."  *Bd. of Trustees, Mich. United Food & Commercial Workers Unions v. Eberhard Foods, Inc.*, 831 F.2d 1258 (6th Cir. 1987) (quoting 29 U.S.C. § 1001a(a)(4)(A) (the preamble to the MPPAA)).  This also "encouraged an employer to withdraw from a financially shaky plan and risk paying its share if the plan later became insolvent, rather than to remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat."  *Milwaukee Brewery*, 513 U.S. at 416-17.  As a result, "a plan's financial troubles could trigger a stampede for the doors, thereby ensuring the plan's demise." *Id*. at 417; *see also Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720-25 & n.2, 104 S. Ct. 2709 (1984) (describing the circumstances that led to enactment of the MPPAA and explaining how the five year look-back rule could actually encourage employer withdrawals in some instances, thereby triggering a "vicious downward spiral" for the affected plan).

In an effort to address these problems – that is, to "provide a disincentive to withdrawals" and to "mitigate their effect" –  Congress enacted the MPPAA.  *Eberhard Foods*, 831 F.2d at 1259. The MPPAA "imposed a withdrawal charge on all employers withdrawing from an underfunded plan" regardless of whether or not the plan later became insolvent.  *Milwaukee Brewery*, 513 U.S.

at 417; *CPT Holdings, Inc.*, 162 F.3d at 407 (The MPPAA "require[s] 'withdrawing employers to pay their share of unfunded, vested benefits regardless of the plan's future success.'").

### 2. Calculation of Withdrawal Liability.

Under ERISA as amended by the MPPAA, withdrawal liability represents an employer's obligation to pay its "proportionate share of the plan's unfunded vested benefits" at the time of withdrawal. *CPT Holdings, Inc.*, 162 F.3d at 407 (citing 29 U.S.C. §§ 1381, 1391; *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 608, 113 S. Ct. 2264 (1993)). The determination of a withdrawing employer's "fair share of a plan's underfunding" is a two-step process. *See Milwaukee Brewery*, 513 U.S. at 417. First, the amount of the plan's "unfunded vested benefits" must be calculated. *Id*. The MPPAA defines unfunded vested benefits as the "difference between the present value of vested benefits . . . 'and the current value of the plan's assets.'" *CPT Holdings, Inc.*, 162 F.3d at 407 (quoting 29 U.S.C. §§ 1381, 1391) (additional citation omitted). Second, the employer's share of the unfunded vested benefits must be determined. *Milwaukee Brewery*, 513 U.S. at 417. The statute sets forth four methods for making this allocation.[11] *See* 29 U.S.C. § 1391. These statutory methods generally base the allocation on "the comparative number of [the] employer's covered workers in each earlier year and the related level of [the] employer's contributions."[12] *Milwaukee Brewery*, 513 U.S. at 417.

Although the concept of withdrawal liability seems relatively straightforward, the considerations, calculations, and assumptions involved in determining the amount of a withdrawing employer's liability are anything but simple. "The amount of a withdrawing employer's liability is initially assessed by the plan sponsor," and if a dispute over the amount of withdrawal liability arises,

---

[11] Three of the allocation methods set forth in the statute – the Presumptive, the Modified Presumptive and the Rolling-5 – "base the determination [of the withdrawing employer's share of unfunded vested benefits] on the employer's share of the plan's contribution base over five-year periods ending with the year before the employer's withdrawal." Jayne E. Zanglein & Susan J. Stabile, *ERISA Litigation* 1238 (2d ed. 2005). The fourth method – Direct Attribution – "bases the determination on the UVB attributable to the employer's employees." *Id*. at 1238-39.

[12] When an employer withdraws during a chapter 11 case, the 1974 Plan argues that a third step is required to determine what portion of the employer's total withdrawal liability should be treated as an administrative expense. That is, the 1974 Plan asserts that the employer's total withdrawal liability must be allocated between the pre- and postpetition periods.

the plan's actuarial assumptions and calculations are presumed correct unless they are proven to be unreasonable in the aggregate or clearly erroneous. *Masters, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727, 730 (4th Cir. 1990); *see* 29 U.S.C. § 1401(a)(3)(A), (B). The wide range of reasonable assumptions that may be used by plan sponsors in making the withdrawal liability calculation has caused the Sixth Circuit to remark that "the actual determination of withdrawal liability is not an exact science." *Eberhard Foods*, 831 F.2d at 1261 (discussing interest rate assumptions and holding that the use of a six percent interest rate by the trustees of a multiemployer plan in determining the employer's withdrawal liability was not unreasonable) (citing *Keith Fulton & Sons v. New England Teamsters*, 762 F.2d 1137, 1142-43 (1st Cir. 1985)); *see also In re CD Realty Partners*, 205 B.R. 651, 658 & n.9 (Bankr. D. Mass. 1997) (noting that the existence and amount of an underfunding, which will lead to withdrawal liability, is related to many factors, several of which "cannot be known or quantified until the employer actually withdraws;" and "[e]ven then, *many can be quantified only by sophisticated guessing and estimating . . . .*") (emphasis added).

For instance, as the bankruptcy court correctly noted, the existence and amount of unfunded vested benefits at the time of withdrawal from a plan is affected by many factors. As previously stated, this calculation first requires a determination of the present value of vested benefits under the plan. The "level of [a] plan's liability for pension benefits . . . may vary over time as a result of changes in contractual promises (such as a negotiated increase in benefit levels), in actuarial assumptions (as to employee longevity, for example), and in other factors." *In re CD Realty Partners*, 205 B.R. at 658; *see also* Jayne E. Zanglein & Susan J. Stabile, *ERISA Litigation* 1237 (2d ed. 2005) (explaining that the valuation of vested benefits under the plan may also require consideration of demographic factors, such as the plan participants' retirement ages and mortality rates). The calculation of the "present value" of vested benefits also requires the plan's actuary to discount the future stream of benefit payments at an appropriate interest rate. *Eberhard Foods*, 831 F.2d at 1259; *see also ERISA Litigation* at 1237. "Increasing the interest rate assumption decreases the employer's withdrawal liability." *Eberhard Foods*, 831 F.2d at 1260. Even "[a] small adjustment in the interest rate assumption can lead to a major change in the withdrawal liability calculation." *Id*.

The value of a plan's assets may likewise be affected by several factors. Chief among these factors are the amounts contributed by participating employers and the "*level of return on the plan's*

*investment of those contributions.*" *In re CD Realty Partners*, 205 B.R. at 658 (emphasis added). The return on the plan's investments is affected by the types of investments chosen by the plan's trustees and the performance of the financial markets. Valuation of the plan's assets also involves the use of various actuarial methods and assumptions. For example, assets may be valued at current market value or under certain other accepted actuarial methods, such as a moving market average ("MMA").[13] *ERISA Litigation* at 1237. In the Fourth Circuit case *USX Corp.*, the pension plan's use of a five-year MMA to value its assets resulted in a withdrawal liability charge against the employer that was seventy-five percent higher than would have been assessed if the plan had used a current market value. *USX Corp.*, 900 F.2d at 731. Although the Fourth Circuit Court of Appeals concluded that the use of the MMA was not unreasonable and did not result in a "substantial undervaluation" of the plan's assets, the case illustrates how relatively small changes in actuarial assumptions can lead to large disparities in asset valuation and, in turn, to large differences in the amount of a plan's unfunded vested benefits. *Id*. at 733.

As demonstrated by the foregoing examples, the amount of a pension plan's unfunded vested benefits may be greatly magnified by factors completely unrelated to the withdrawing employer or its covered employees. The individual employer's proportionate share of the unfunded vested benefits is more closely linked to the employer's past participation in the plan but, at least under the Rolling-5 method, also depends on the hours worked by employees of other contributing employers. *Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 103 (2d Cir. 1986) (an employer's proportionate share of a plan's unfunded vested benefits is "extrapolate[d] . . . from such factors as the employer's past contributions to the plan and the portion of the plan's unfunded benefit obligations attributable to the employer's employees) (citation omitted).

---

[13] As explained by the United States Court of Appeals for the Fourth Circuit, a five-year MMA approach values a plan's assets:

> by using the average value of those assets over the past five years, with each year's market value equally weighted in the computation. A five-year MMA is a conservative approach to asset valuation, as it takes account of changes in asset value at the rate of 20% per year; in other words, an increase or decrease in the [plan's] assets will only be fully incorporated into the valuation after five years. Thus, the MMA approach moderates the impact of severe fluctuations in the stock market.

*USX Corp.*, 900 F.2d at 731.

In the bankruptcy context, a question is also presented as to when a claim for withdrawal liability arises. The Sixth Circuit addressed this question in *CPT Holdings, Inc.*, 162 F.3d 405. In *CPT Holdings*, the debtor withdrew from its pension plan eighteen months *after* its chapter 11 plan was confirmed. The issue was whether the pension plan had a "claim" for withdrawal liability as of the date of confirmation, such that the claim was discharged. *See* 11 U.S.C. § 1141(d)(1)(A) (unless the plan or confirmation order provides otherwise, confirmation "discharges a debtor from any debt that arose before the date of such confirmation"). Answering this question in the negative, the Sixth Circuit held that a "claim" for withdrawal liability "cannot exist prior to withdrawal." *Id.* at 409. The court explained that, in contrast to an employer's failure to satisfy monthly or annual funding requirements, which would give rise to an immediate right to payment by the plan, "withdrawal liability is premised on an employer's proportionate share of unfunded vested benefits *at the time of withdrawal*." *CPT Holdings, Inc.*, 162 F.3d at 407 (emphasis in original) (citations omitted); *see also ERISA Litigation* at 1210 (withdrawal liability is "an immediate and noncontingent liability that the employer owes to the plan when it withdraws"). Accordingly, "[a] multiemployer pension plan has no enforceable right to payment for withdrawal liability until an employer actually withdraws from a plan, leaving the plan underfunded. Since this may never occur, it cannot be said that a legal right to payment exists prior to withdrawal." *CPT Holdings, Inc.*, 162 F.3d at 409. In light of this binding authority, the bankruptcy court properly determined that the withdrawal liability claim in this case did not arise until the Debtors withdrew from the 1974 Plan, almost two years postpetition.[14]

---

[14] Although the bankruptcy court did not address Lexington Coal's assertion that the Debtors' withdrawal liability stemmed from their rejection of the collective bargaining agreements, and thus should relate back to the date immediately preceding the filing of the chapter 11 case under § 365(g) and § 502(g) , we note that the Sixth Circuit's decision in *CPT Holdings* severely undercuts this argument. Withdrawal liability does not derive from the collective bargaining agreements themselves, but "is a product of the MPPAA." *CPT Holdings, Inc.*, 162 F.3d at 407; *see McFarlin's, Inc.*, 789 F.2d at 104 n.2. As the Sixth Circuit explained in *CPT Holdings*, "there can be no pre-withdrawal breach of ERISA giving rise to a 'right to payment' by a plan." *CPT Holdings, Inc.*, 162 F.3d at 409. Accordingly, "a 'claim' cannot exist prior to withdrawal." *Id*.

**B.      The "Benefit to the Estate" Test.**

As the bankruptcy court explained, the fact that the Debtors' withdrawal liability arose postpetition does not automatically mean that the liability, or any portion thereof, is an administrative expense. *See Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) ("A debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate."). To be afforded administrative priority, the claim must still meet the statutory definition and the test utilized by the Sixth Circuit.

The Bankruptcy Code grants administrative priority status to claims for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]" 11 U.S.C. § 503(b)(1)(A); *see* 11 U.S.C. § 507(a)(1). The purpose of this provision "at least in the liquidation context, is to facilitate the continued operation . . . of debtors-in-possession 'by encouraging third parties to provide those businesses with necessary goods and services' that enable the maximization of value for creditors of the estate upon liquidation." *Zurich Am. Ins. Co. v. Lexington Coal Co. (In re HNRC Dissolution Co.)*, 371 B.R. 210, 224 (E.D. Ky. 2007), *aff'd*, 536 F.3d 683 (6th Cir. 2008) (quoting *United Trucking Serv., Inc. v. Trailer Rental Co. (In re United Trucking Serv., Inc.)*, 851 F.2d 159, 161 (6th Cir. 1988)). Because "priority claims reduce the funds available for creditors and other claimants," it is well established that "[c]laims for administrative expenses under § 503(b) are strictly construed." *City of White Plains, N.Y. v. A&S Galleria Real Estate, Inc. (In re Federated Dept. Stores, Inc.)*, 270 F.3d 994, 1000 (6th Cir. 2001); *see McFarlin's, Inc.*, 789 F.2d at 101-02 (citations omitted).

To determine whether a claim qualifies as an "actual and necessary" administrative expense, the Sixth Circuit routinely applies the "benefit to the estate test." *See Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 816 (6th Cir. 1997). Under this test, a debt qualifies as an administrative expense "only if (1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate." *Id.* (citing *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.),* 831 F.2d 106, 110 (6th Cir. 1987) (additional citations omitted)). "The claimant has the burden of demonstrating entitlement to an administrative expense priority by a preponderance of the evidence." *In re Liberty Fibers Corp.*, 383 B.R. 713, 717 (Bankr. E.D. Tenn. 2008).

For purposes of this appeal, the Panel will assume that the 1974 Plan's administrative claim arose from a transaction with the bankruptcy estate, thereby satisfying the first prong of the "benefit to the estate" test. The 1974 Plan's administrative claim arose during the postpetition period and assertedly relates to postpetition hours worked by the Debtors' employees. *See In re Sunarhauserman*, 126 F.3d at 817 ("[I]t is an absolute requirement for administrative expense priority that the liability at issue arise post-petition.")

Accordingly, the central, and ultimately dispositive, issue in this appeal is whether the 1974 Plan has demonstrated that the asserted prorated postpetition portion of the Debtors' withdrawal liability directly and substantially benefitted the estate. Neither the Bankruptcy Code nor the Sixth Circuit has defined the terms "direct" and "substantial," so we must construe these terms in accordance with their ordinary meanings. *See The Limited, Inc. v. Comm'r*, 286 F.3d 324, 332 (6th Cir. 2002) ("When the text of a statute contains an undefined term, that term receives its ordinary and natural meaning.") (citation omitted).

The dictionary definition of "direct" suggests that the asserted benefit must be "free from extraneous influence" and "immediate." *Black's Law Dictionary* (8th ed. 2004); *Webster's Third New International Dictionary* 640 (1986) (direct means "stemming immediately from a source; having no compromising or impairing element; characterized by or giving evidence of a close . . . causal . . . relationship; marked by absence of an intervening agency, instrumentality, or influence"); *cf., e.g., Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d 1246, 1252 (10th Cir. 2001) ("When Congress does not define a word [in a statute], its common and ordinary usage may be obtained by reference to a dictionary."). To be considered "substantial," the benefit must also be "real," "true," "important" or "essential." *Webster's Third New International Dictionary* 2280 (1986); *see also In re Kmart Corp.*, 290 B.R. 614, 621 (Bankr. N.D. Ill. 2003) (The administrative "claimant must demonstrate that the benefit is more than a speculative or potential benefit.").

The 1974 Plan argues that the Debtors' employees provided a benefit to the bankruptcy estate by continuing to work after the filing of the Debtors' chapter 11 case. The record establishes that the Debtors operated for almost two years after filing their chapter 11 petitions. During this time period, the Debtors' UMWA employees worked a combined total of 2,976,962 hours. In addition

to wages, the compensation for these employees included the accrual of pension credit for the hours worked during the postpetition period. According to the 1974 Plan, the work of these employees facilitated the continued operation of the Debtors during the chapter 11 proceeding, preserved the businesses' going-concern value, and eventually led to the sale of the Debtors' assets at a favorable price.

This Panel agrees with the 1974 Plan's assertion that the Debtors' bankruptcy estate benefitted from the postpetition work provided by its UMWA employees. We further agree that debts with a direct relationship to the postpetition work of the Debtors' employees may be entitled to administrative status. *See In re William B. Kessler, Inc.*, 23 B.R. 722, 726 (Bankr. S.D.N.Y. 1982), *aff'd*, 55 B.R. 735 (S.D.N.Y. 1985) (stating that employees who work postpetition are entitled to receive full benefits flowing directly from their postpetition employment). For the reasons that follow, however, we hold that the 1974 Plan failed to establish that its withdrawal liability claim relates directly to the work performed by the Debtors' employees postpetition. Therefore, the claim is not entitled to priority as an administrative expense.

The consideration for the postpetition work of the Debtors' employees, which unquestionably benefitted the estate, included the payment of postpetition wages to these employees, as well as accrual of other benefits, such as vacation pay. The Bankruptcy Code recognizes the importance of this postpetition work by explicitly granting postpetition wages and other benefits attributable to postpetition employment administrative priority, provided the employees' services are necessary to the preservation of the bankruptcy estate. 11 U.S.C. §503(b)(1)(A) (affording administrative priority to "the actual, necessary costs and expenses of preserving the estate, including *wages, salaries, and commissions for services rendered after the commencement of the case . . .*") (emphasis added); *see generally* William L. Norton, Jr., *Norton Bankruptcy Law and Practice 3d*, § 49:20 (stating that allowance of administrative claims for postpetition wages is fairly routine in chapter 11 cases where the debtor's business continues to operate postpetition and noting that most courts also allow administrative claims for some types of vacation and severance pay).

In addition to wages, the Sixth Circuit has held that the "normal" cost component of a debtor's postpetition minimum funding contributions to a defined benefit pension plan may be given priority as administrative expenses under § 503(b)(1)(A), at least to the extent it relates to hours

actually worked by a debtor's employees postpetition. *In re Sunarhauserman*, 126 F.3d at 816-17. In *Sunarhauserman*, the Pension Benefit Guaranty Corporation ("PBGC") filed an administrative claim against the debtors for unpaid minimum funding contributions that accrued between the filing of the debtors' bankruptcy cases and the termination of the debtors' pension plan. The PBGC's administrative claim included a "normal" cost component, which represented an actuarial calculation of the cost of pension benefits based on projected employment of the debtors' employees during the plan year. The claim also included a "non-normal" cost component, which consisted almost entirely of an actuarial allocation of experience losses attributable to prepetition liabilities. The bankruptcy court allowed the "normal" cost component of PBGC's administrative claim, but adjusted the amount of the claim to account for workforce reductions and a freeze in benefit accruals that occurred postpetition. The bankruptcy court concluded, however, that the "non-normal" cost component of PBGC's claim was not entitled to administrative priority. *In re Sunarhauserman, Inc.*, 184 B.R. 273, 278 (Bankr. N.D. Ohio 1995). On appeal, the district court affirmed the bankruptcy court's decision.

In *Sunarhauserman*, the Sixth Circuit affirmed the decisions of the bankruptcy and district courts. Applying the "benefit to the estate" test, the court explained that "it is an absolute requirement for administrative expense priority that the liability at issue arise post-petition." *In re Sunarhauserman*, 126 F.3d at 817. The court recognized that the liability for the entire amount of PBGC's claim arose under ERISA when the plan year ended during the administration of the debtors' bankruptcy cases. This did not, however, result in the entire claim being allowed as an administrative expense. Rather, the court explained that "regardless of the substantive law on which the claim is based, the proper standard for determining that claim's administrative priority looks to when the acts giving rise to a liability took place, not when they accrued." *Id*. at 818 (citing *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984); *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950 (1st Cir. 1976)). Because the "non-normal" cost component of the PBGC's claim related to prepetition liabilities, the Sixth Circuit concluded that it was not entitled to administrative priority. The Sixth Circuit also reduced the "normal" cost component of PBGC's claim to account for workforce reductions and a freeze in benefit accruals that occurred postpetition. The court acknowledged that, under ERISA, the debtors were bound to fully fund the plan after their bankruptcy cases were filed, regardless of the changes in plan benefits that subsequently occurred

during the plan year. The court explained, however, that it was "appropriate to view as 'actual and necessary' only that portion of the [d]ebtors' post-petition funding obligation that [could] be tied to employees' actual post-petition services – i.e., hours actually work by employees post-filing." *Id*. at 820. Accordingly, the "normal" cost component of PBGC's claim was entitled to administrative priority, but only to the extent that it related to benefits actually earned postpetition.

If postpetition minimum funding contributions to a pension plan may be given administrative priority under the Sixth Circuit's decision in *Sunarhauserman*, it seems appropriate to assert that claims for withdrawal liability relating to postpetition work by a debtor's employees should also be entitled to priority status. After all, as explained by the bankruptcy court in *In re Pulaski Highway Express*:

> Employees as part of the collective bargaining process negotiate the terms and conditions of their pension rights, and that obligation is enforceable by the union members as either a contractual or statutory right. It is an integral part of the compensation scheme agreed to by the debtor and its employees. *See* ERISA § 502, 29 U.S.C. § 1132(a)(3) and *see also* H.R. Rep. No. 869, 51, 53, *reprinted in* 1980 U.S. Code Cong. & Ad. News at 2921. The essence of withdrawal liability is to ensure that employees receive the benefits which they have bargained for and earned. *See* H.R. Rep. No. 869, 53 *reprinted in* 1980 U.S. Code Cong. & Ad. News at 2921.

*In re Pulaski Highway Express, Inc.*, 57 B.R. 502, 508 n.11 (Bankr. M.D. Tenn. 1986). In light of its conclusion that withdrawal liability is part of the compensation given to employees in consideration for their postpetition efforts, the *Pulaski* court determined that the withdrawal liability claim in that case should be prorated, with the postpetition portion of the claim being entitled to treatment as an administrative expense. The court reasoned that, "[a]lthough withdrawal liability may be triggered by a post-petition event," the "'right to payment' is incurred when the employee benefits become nonforfeitable." *Id*. at 507. "Because the 'claim' for bankruptcy purposes arises from the accrual of employees' vested rights rather than the act of withdrawal, and because the debtor did have a short period of post-petition operations," the court concluded that a portion of the pension plan's claim could be "properly characterized as post-petition." *Id*. 507-08. The *Pulaski* court declined to determine, on the record before it, what portion of the claim was entitled to administrative status. The court noted that ERISA provides four different methods for calculating withdrawal liability, but acknowledged that none of those methods were "designed with the task here

in mind – the allocation of withdrawal liability across a point in time formed by a bankruptcy filing." *Id*. at 511 n.17.

Several other courts appear to agree with *Pulaski*'s conclusion that withdrawal liability should be divided into pre- and postpetition components, and that the postpetition portion of the claim may be afforded administrative priority. *See, e.g.*, *McFarlin's, Inc.*, 789 F.2d at 103 (holding that withdrawal liability claim was not entitled to administrative priority because the consideration supporting the claim was the work of the debtor's employees during the prepetition period); *In re Great Northeastern Lumber & Millwork Corp.*, 64 B.R. 426, 428 (Bankr. E.D. Pa. 1986) (concluding that withdrawal liability claims are not entitled to administrative status unless they are "attributable to wages earned after the filing of the petition"); *In re Cott Corp.*, 47 B.R. 487, 495 (Bankr. D. Conn. 1984) (dividing withdrawal liability claim into pre- and postpetition components based upon the period covered by the claim and affording the postpetition portion priority as an administrative claim). The reasoning of these courts is similar to *Pulaski*'s analysis. As the United States Court of Appeals for the Second Circuit has explained, withdrawal liability "is designed to insure that before leaving a plan an employer would pay his 'proportionate' share of the plan's liability for vested but unfunded benefits attributable to work already performed. That liability usually accumulates over a period of years prior to the departure of the withdrawing employer." *McFarlin's, Inc.*, 789 F.2d at 103 (internal citations omitted). Therefore, "[t]he consideration supporting the withdrawal liability is . . . the same as that supporting the pensions themselves, the past labor of the employees covered by the [p]lan." *Id*. at 101-02 (citations omitted). According to the Second Circuit, the withdrawal liability claim is treated as a general unsecured claim to the extent this past labor occurred prepetition. Other courts have extended this premise to conclude that, to the extent the labor occurred postpetition, the resulting claim might be entitled to administrative priority. *See, e.g., In re Cott Corp.*, 47 B.R. at 495.

In this circuit, the reasoning of *Pulaski* and these other courts has been severely eroded by *CPT Holdings*. In *CPT Holdings* the Sixth Circuit unequivocally held that a claim, or "right to payment," for withdrawal liability could not arise prior to a debtor's actual withdrawal from its pension plan. *CPT Holdings, Inc.*, 162 F.3d at 409. Thus, *Pulaski*'s determination that a withdrawal liability claim arises from the on-going accrual of employees' vested rights rather than from the withdrawal itself has been unquestionably constrained, if not negated, by Sixth Circuit case law.

In the present appeal, the 1974 Plan correctly asserts that the Debtors' UMWA employees worked during the postpetition period and earned pension credit as a result of that work. Under the Rolling-5 method, these hours were included in the calculation of the Debtors' total withdrawal liability – that is, the determination of the Debtors' share of the 1974 Plan's unfunded vested benefits at the time of withdrawal.[15] After determining the Debtors' share of the total unfunded vested benefits, the 1974 Plan utilized another calculation to attempt to prorate the liability between the prepetition and postpetition periods. We summarize the formula as follows: the first multiplier is the postpetition hours worked by the Debtors' covered employees divided by the total hours worked by the covered employees both pre- and postpetition. This fraction is then multiplied by the statutory withdrawal liability. The product is the prorated withdrawal liability that is asserted as an allowable administrative expense.

The major issue, however, and the basis for our disagreement with *Pulaski* and other cases that advocate proration of the withdrawal liability claim, is that the amount of withdrawal liability to be assessed against a withdrawing employer, if any, is *always* dependent upon factors that are not directly related to the postpetition work of a debtor's employees. As discussed in detail above, the first step in determining an employer's withdrawal liability is to calculate the plan's unfunded vested benefits at the time of withdrawal. The existence of unfunded vested benefits at any point in time is, in turn, driven by a myriad of factors including interest rate assumptions, the performance of a plan's investments, and other actuarial methods utilized by the plan's sponsors. *See In re CD Realty Partners*, 205 B.R. at 658 & n.9 (the existence and amount of an underfunding, which will lead to withdrawal liability, is related to many factors which "*can be quantified only by sophisticated guessing and estimating . . . .*") (emphasis added). The influence of these outside factors and investment market results on the withdrawal liability calculation are illustrated in this appeal. The 1974 Plan acknowledges that the actuarial funding deficit it experienced in the Plan Year ending June 30, 2001, was the result of a "number of factors, including a significant dip in the stock market, a lack of incoming contributions, and changes in pensions." (Appellant's Br. at 8.) Moreover, the 1974 Plan's calculation of its total unfunded vested benefits at the end of the 2004 Plan Year was reduced from approximately $2.1 billion to approximately $1.8 billion as the result of a change in

_____

[15] The determination of the Debtors' share of the total unfunded vested benefits is problematic. Depending upon the method used, this determination might vary greatly.

the 1974 Plan's interest rate assumption. This revised interest rate assumption caused the Debtors' total withdrawal liability to decrease from approximately $163 million at the time the original claim was filed to approximately $138 million, which is the basis for the Amended Claim.

The impact of these outside factors on the assessment of withdrawal liability is the essential element that distinguishes withdrawal liability from other consideration for the postpetition work of a debtor's employees. As discussed above, wages have a direct causal link to an employees' postpetition work and are generally allowed as administrative expenses. *See* 11 U.S.C. § 503(b)(1)(A). "Normal" contributions to a pension plan are also typically linked to the hours worked by a debtor's employees. Thus, these contributions may be allowed as administrative expenses under the Sixth Circuit's decision in *Sunarhauserman*. However, to emphasize its holding that such contributions could only be afforded priority to the extent that they were linked to "hours actually worked by employees post-filing," the *Sunarhauserman* court reduced the administrative claim in that case to account for workforce reductions and a freeze in benefit accruals that occurred postpetition. *In re Sunarhauserman*, 126 F.3d at 820.

Withdrawal liability claims do not have the same causal connection to the postpetition work performed by a debtor's employees as these other categories of expenses. This is because the calculation of a plan's unfunded vested benefits and consequently, the assessment of withdrawal liability against a particular employer, will always be a function of numerous factors that are not, and cannot be, directly linked to the postpetition work supplied by the Debtors' employees. The most significant factor may be the return on the investments of the pension funds. *See In re CD Realty Partners*, 205 B.R. at 658.

Recent economic and stock market gyrations, mostly downward, support our analysis. The investment performance of many retirement funds has been detrimentally affected. The withdrawal liability imposed as a result of a plan terminated last week will be far greater than withdrawal liability that may have arisen a year ago. The amount of the liability, along with any attempted proration thereof, is significantly impacted by market forces. These forces undercut the assertion that the prorated liability resulted from a "direct and substantial" benefit to the estate.[16]

---

[16] On October 9, 2007, the Dow Jones Industrial Average ("DJIA"), a leading stock market indicator, reached an all-time high at 14,164.53. One year and one day later, on October 10, 2008,

Accordingly, we conclude, as a matter of law, that claims for withdrawal liability lack the requisite causal relationship to the work performed by the Debtors' employees for the claim to be treated as an administrative expense. In light of this conclusion, we need not consider the 1974 Plan's assertion that it should be permitted to present additional factual evidence in support of its calculation of its administrative claim. Indeed, based upon our review of the entire record, we believe that the 1974 Plan was given an adequate opportunity to attempt to prove that its withdrawal liability claim is entitled to administrative status. Regardless of how the employer's proportionate share of a plan's unfunded vested benefits may be determined or how the withdrawal liability is allocated between pre- and postpetition periods, the calculation will always be based upon factors that are not directly related to the alleged benefit to the debtor's estate. Consequently, the resulting claim (and perhaps any claim) for withdrawal liability has only a tenuous connection to the postpetition work of the Debtors' employees and cannot be deemed to have directly and substantially benefitted the estate.

---

the DJIA closed at 8,451.19. *Markets Lineup*, Wall St. J., Oct. 13, 2008, at C4. On the next day that the markets opened, October 13, 2008, the DJIA surged upward by 936 points, the largest one-day gain (approximately 11%) since the 1930s. Mark Landler, *Stock Markets Rally Worldwide – Biggest Intervention Since '30s*, N.Y. Times, Oct. 14, 2008, at A1. The DJIA closed at 9,387.61. *Id*. at B1.

Even during the mid-point of the downward stock market decline, commentators recognized the detrimental effect upon pension funds' investments. Mary Williams Walsh, *Market Turmoil Leaves Big Pension Funds Falling Short*, N.Y. Times, Apr. 17, 2008, at C3 (explaining that turmoil in the financial markets results in adverse consequences from equity investments and interest rate swings). The current crisis has adversely affected multi-employer pension plans for unionized workers such as the 1974 Plan. Kris Maher, *Unions Seek Pension Protections in Bailout*, Wall St. J., Sept. 25, 2008, at A6 ("Many of these pension funds assumed a 7% annual return on their investments, but have lost money instead." For example, the Teamster's Central States Fund, previously valued at $24 billion, lost $3 billion in assets during the first six months of 2008.); *see also* Craig Karmin et al., *Calpers May Lift Contribution Rate*, Wall St. J., Oct. 23, 2008, at A3 (noting that that the assets of the California Public Employees' Retirement System, commonly known as Calpers, "have declined by more than 20%, or at least $48 billion, from the end of June through Oct. 10").

Given the above, one notes that investment losses will have a direct and substantial impact on the potential withdrawal liability of any of the 1974 Plan's contributing employers. Such impact on withdrawal liability will be far greater than any potential loss (or gain) resulting solely from employees' continued work during a chapter 11 administrative period. As important as employees' work efforts may be, for administrative expense analysis, those efforts pale in comparison to the vagaries of the market investment results.

## C.      The *Reading v. Brown* Exception.

Finally, the 1974 Plan asserts that the "benefit to the estate" standard does not apply to its claim because withdrawal liability is a statutorily-imposed obligation that was incidental to the postpetition operation of the Debtors' businesses. To support this assertion, the 1974 Plan relies upon *Reading Co. v. Brown*, 391 U.S. 471, 88 S. Ct. 1759 (1968), for the principle that a claim may be afforded administrative priority even if it does not benefit or help preserve a debtor's estate, so long as the claim relates to certain aspects of the estate's postpetition operations.

The debtor in *Reading* was under the protection of a bankruptcy receivership[17] when its primary asset, an eight-story industrial building, was totally destroyed by fire. The fire spread to adjoining properties and damaged several neighboring businesses. After the debtor was adjudicated bankrupt and the receiver was appointed trustee, the owners of the adjoining properties filed more than $3.5 million in claims against the debtor's bankruptcy estate. The Reading Company, one of the fire loss claimants, asserted that its claim was entitled to administrative priority because the fire was caused by the negligence of the receiver in operating the debtor's business. The trustee objected to allowance of the claim as an administrative expense on the ground that payment of the fire loss claim would confer no benefit on the debtor's bankruptcy estate.

The Supreme Court held that the fire damage claim, which resulted from the postpetition negligence of the receiver, was an "actual and necessary cost" of operating the debtor's business, even though payment of the claim provided no benefit to the bankruptcy estate. The Court explained that "actual and necessary costs" should "include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible." *Reading*, 391 U.S. at 483. In reaching this conclusion, the Court cited "one important, and here decisive" objective of the bankruptcy laws: "fairness to all persons having claims against an insolvent." *Id*. at 477. The Court noted that by postponing their claims during a Chapter XI arrangement, the debtor's prepetition unsecured creditors could hope to benefit from a successful rehabilitation of the debtor and "eventually recover from the debtor either in full or in larger proportion than they would in

___

[17] *Reading* was decided under § 64a(1) of the former Bankruptcy Act, the predecessor to § 503(b). However, because the two statutory sections are similar, courts have consistently applied the reasoning of *Reading* to cases under the Bankruptcy Code. *See, e.g.*, *Ala. Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co.)*, 963 F.2d 1449, 1455-56 (11th Cir. 1992).

immediate bankruptcy." *Id*. at 478. The fire loss claimant, by contrast, "did not merely suffer injury at the hands of an insolvent business: it had an insolvent business thrust upon it by operation of law." *Id*. The Court reasoned that:

> in considering whether those injured by the operation of the business during an arrangement should share equally with, or recover ahead of, those for whose benefit the business is carried on, the latter seems more natural and just. Existing creditors are, to be sure, in a dilemma not of their own making, but there is no obvious reason why they should be allowed to attempt to escape that dilemma at the risk of imposing it on others equally innocent.

*Id*. at 482-83.

In applying *Reading*, courts have actively limited the use of the exception to claims for tort damages, or cases involving intentional misconduct by the trustee or debtor-in-possession. *Beneke Co. v. Econ. Lodging Sys., Inc. (In re Econ. Lodging Sys., Inc.)*, 234 B.R. 691, 698 (B.A.P. 6th Cir. 1999); *see also Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 758 (9th Cir. 1998) ("The *Reading* exception operates to deter the trustee from injuring third parties."). For example, in *Charlesbank Laundry*, the First Circuit granted administrative priority to a claim for civil compensatory damages stemming from the debtor's operation of its laundry facility in violation of zoning laws and a temporary injunction. *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200 (1st Cir. 1985). The First Circuit explained:

> We see no reason why the claim of plaintiffs in this case does not fall within both the letter and the spirit of *Reading*. The same fairness principle favors plaintiffs here, whose premises, lives, or businesses were adversely affected by [the debtor's] continuing conduct in violation of the temporary injunction.

*Id*. at 202. In fact, the court suggested that the facts before it presented a potentially stronger case for priority than those in *Reading*, because the debtor *deliberately* operated its business in violation of the zoning laws and injunction. "If fairness dictates that a tort claim based on negligence should be paid ahead of pre-reorganization claims, then . . . an intentional act which violates the law and damages others should be so treated." *Id*. at 203. Similarly, in *Al Copeland Enterprises*, the Fifth Circuit granted administrative expense priority to an award of interest on sales taxes wrongfully and deliberately withheld by a chapter 11 trustee. *Al Copeland Enters., Inc. v. Tex. (In re Al Copeland*

*Enters., Inc.)*, 991 F.2d 233, 238 (5th Cir. 1993). Finally, in a slight extension of the *Reading* exception, the Eleventh Circuit in *N.P. Mining* allowed an administrative expense claim for *punitive* civil penalties assessed as a result of postpetition environmental violations committed during the operation of the chapter 11 debtor's strip mining business. *Ala. Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co.)*, 963 F.2d 1449, 1455-56 (11th Cir. 1992) (acknowledging that, unlike compensatory damages, the penalties would not be used to repair the environmental damage or to protect the public's health, but holding that under *Reading* and 28 U.S.C. § 959(b) penalties assessed for postpetition mining operations are "costs ordinarily incident to the operation of a business" and are entitled to administrative priority); *but see Penn. Dept. of Envtl. Res. v. Tri-State Clinical Labs., Inc.*, 178 F.3d 685 (3d. Cir. 1999) (punitive criminal fines for illegally disposing of infectious waste postpetition are not entitled to administrative priority).

To our knowledge, the Sixth Circuit has granted administrative priority under the *Reading* exception on only one occasion. *See Lancaster v. Tenn. (In re Wall Tube & Metal Prods. Co.)*, 831 F.2d 118 (6th Cir. 1987). In *Wall Tube*, the Sixth Circuit determined that response costs incurred by the State of Tennessee as a result of hazardous wastes stored at the debtor's manufacturing site were entitled to administrative priority. The court explained that prior Supreme Court decisions "have created a special emphasis on the importance of complying with laws that protect the public health and safety." *Id*. at 123 (citing *Midlantic Nat'l Bank v. N.J. Dept. of Envtl. Protection*, 474 U.S. 494, 106 S. Ct. 755 (1986) and *Ohio v. Kovacs*, 469 U.S. 274, 105 S. Ct. 705 (1985)). In *Wall Tube*, it was undisputed that the hazardous substances on the debtor's property could have caused as many as fifteen different health problems, ranging from loss of consciousness to death, to anyone who came into contact with them. When the debtor, and later its trustee, did nothing to remedy these health hazards, the State of Tennessee was entitled under its own state laws and CERCLA to "expend funds to assess the gravity of the environmental hazard." *Id*. at 124. Although these expenses produced no corresponding benefit to the estate, the court held that the expenses were "actual and necessary, both to preserve the estate in required compliance with state law and to protect the health and safety of a potentially endangered public." *Id*.

At least one judge on the Sixth Circuit has suggested that the reasoning in *Wall Tube* should be applied beyond the context of environmental cases. *See Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 821 (6th Cir. 1997) (Kennedy,

J., dissenting). The dissenting judge opined that both the "normal" and "non-normal" components of a debtor's postpetition minimum funding contributions under ERISA should be entitled to administrative priority. Judge Kennedy reasoned that, like environmental response costs under CERCLA, the "costs of complying with a regulatory scheme [in this case, ERISA] are administrative expenses, regardless of whether they 'benefit the estate' in a practical way." *Id*. at 821. Judge Kennedy noted that "[a]lthough protection of the environment is an important goal, so is protection of pension funds." *Id*. at 822. Accordingly, she concluded that "[i]f compliance with a given statute or regulation is necessary to operate as a business, then the costs of such compliance necessarily should be an administrative expense." *Id*.

The *Sunarhauserman* majority did not directly address *Wall Tube* or Judge Kennedy's comparison of ERISA minimum funding contributions to response costs under CERCLA. Instead, the court generally found the *Reading* exception inapplicable based on the fact that the non-normal component of PBGC's claim related to liabilities that arose prepetition. *Id*. at 817. The majority explained that "*Reading* does not eliminate the requirement that a debt arise post-petition in order to be accorded administrative expense priority." *Id*. Because the non-normal portion of PBGC's claim related to prepetition liabilities, the majority held that *Reading* "would not justify granting administrative priority to the entirety of Pension Benefit's claim."[18] *Id*.

In the present appeal, there is no question that the 1974 Plan's withdrawal liability claim arose postpetition and partially relates to postpetition work by the Debtor's employees. *See CPT Holdings, Inc. v. Indus. & Allied Employees Union Pension Plan, Local 73*, 162 F.3d 405, 409 (6th Cir. 1998). Accordingly, the grounds on which the *Sunarhauserman* majority declined to apply *Reading* are not relevant in this instance. Nevertheless, we find that the 1974 Plan's withdrawal liability claim is not the type of claim to which the narrow *Reading* exception applies. Unlike other

---

[18] The majority's holding in *Sunarhauserman* appears to be in line with a number of cases declining to apply the *Reading* exception to claims stemming from prepetition contracts. *See, e.g*, *In re Weinschneider*, 395 F.3d 401 (7th Cir. 2005) (declining to extend the *Reading* exception to an attorney's claim for breach of a covenant not to sue); *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385 (5th Cir. 2001) (declining to extend exception to non-debtor litigant's claim for attorney fees, costs and expenses awarded to it as prevailing party in chapter 7 trustee's postpetition suit for breach of prepetition contract)*; In re Abercrombie*, 139 F.3d 755 (denying administrative priority to claim for attorney fees awarded postpetition against chapter 11 debtor in real estate contract action initiated prepetition).

cases that have applied the exception, the withdrawal liability claim does not stem from tortious or deliberate misconduct by the Debtors. As discussed previously, withdrawal from multiemployer pension plans is permitted, and even anticipated, under ERISA. The assessment of withdrawal liability against an employer seeks to discourage withdrawals from multiemployer pension plans and, when they occur, to mitigate the negative impact of the withdrawal on employees and other participating employers. Withdrawal liability is not a penalty for wrongful conduct. The Debtors were within their rights when they terminated operations and withdrew from the 1974 Plan. Therefore, we find that the resulting withdrawal liability is not entitled to administrative priority under *Reading* and its progeny.

We likewise decline to extend the *Reading* exception to the 1974 Plan's claim on the basis that, like the environmental claims in *Wall Tube*, compliance with ERISA, including payment of withdrawal liability, is a cost of operating the debtor's business that should be treated as an administrative expense. Although protection of pension funds is an unquestionably important goal, we do not believe that the special concern for the public health and safety present in *Wall Tube* and the other environmental cases is implicated in the present appeal. *See, e.g.*, *In re Sunarhauserman*, 184 B.R. 273, 276-77 (Bankr. N.D. Ohio 1995), *aff'd*, 126 F.3d 881 (6th Cir. 1997) (distinguishing minimum funding requirement under ERISA from environmental regulations designed to protect the public health and safety). Any extension of the *Reading* exception to statutory withdrawal liability is best undertaken by the United States Court of Appeals for the Sixth Circuit, the Supreme Court, or Congress.[19]

## V. CONCLUSION

For the foregoing reasons, we conclude that the 1974 Plan failed to establish, as a matter of law, that its withdrawal liability claim "directly and substantially" benefitted the Debtors' estates. Further, because the withdrawal liability claim does not stem from tort damages or intentional misconduct on the part of the Debtors, the *Reading* exception does not apply and the claim is not

---

[19] In the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Congress demonstrated its ability to give statutory liabilities administrative status. *See* 11 U.S.C. § 503(b)(9) (granting administrative priority to a particular category of reclamation claims).

entitled to administrative priority on that basis. Accordingly, the bankruptcy court's disallowance of the 1974 Plan's claim is AFFIRMED.